UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
In re:

FRONTIER INSURANCE GROUP, INC. and
FRONTIER INSURANCE GROUP, LLC,

                              Debtor/Reorganized Debtor.
------------------------------------------------------------------------x

BENJAMIN LAWSKY, SUPERINTENDENT OF
FINANCIAL SERVICES OF THE STATE OF NEW YORK,
AS LIQUIDATOR OF FRONTIER INSURANCE
COMPANY,

                            Plaintiff-Appellant,

        - against -

FRONTIER INSURANCE GROUP, LLC,

                            Defendant-Appellee.
------------------------------------------------------------------------x

**OPINION AND ORDER**

18-CV-3211 (CS)

Appearances:

William F. Costigan
Costigan Law PLLC
New York, New York
*Counsel for Plaintiff-Appellant*

Robert E. Malchman
Allegaert Berger & Vogel LLP
New York, New York
*Counsel for Defendant-Appellee*

Seibel, J.

       Before the Court is the appeal of Plaintiff-Appellant Benjamin Lawsky, Superintendent

of Financial Services of the State of New York[1] in his capacity as Liquidator (the "Liquidator")

---

[1] The current Superintendent of Financial Services is Maria T. Vullo.

1

of Frontier Insurance Company ("FIC"), from the bankruptcy court's February 15, 2018 Memorandum of Decision After Trial, (Bankr. Doc. 66 ("Trial Dec."),)[2] and March 12, 2018 Partial Judgment, (Bankr. Doc. 72), ruling that Defendant-Appellee Frontier Insurance Group, LLC ("FIGL") holds title to, and all reversionary interests in, land and improvements thereon in Sullivan County, New York, that the parties have labeled in this litigation "Parcels B and C." For the following reasons, the bankruptcy court's orders are AFFIRMED.

## I.    BACKGROUND

### A.    Facts

#### 1.    Parties

In 2001, the Supreme Court of the State of New York placed FIC in a temporary rehabilitation proceeding under the New York Insurance Law, and subsequently entered a final rehabilitation order. (Bankr. Doc. 74-23.) The rehabilitation order vested the Superintendent of Insurance (the "Rehabilitator") with ownership and possession of FIC's property. (Bankr. Doc. 55 ¶ 46.) The Superintendent of Insurance is the statutory predecessor of the Superintendent of Financial Services, meaning the Rehabilitator is Plaintiff-Appellant's predecessor. (*Id.* ¶ 45.)

Frontier Insurance Group, Inc. ("FIGI") was the corporate parent of FIC, and on July 5, 2005, FIGI filed a voluntary petition in the U.S. Bankruptcy Court for the Southern District of New York for relief under chapter 11 of title 11 of the United States Code. *In re Frontier Ins. Grp., Inc.*, No. 05-36877 (Bankr. S.D.N.Y.), Doc. 1. Under FIGI's chapter 11 plan, FIGL became FIGI's successor. (*See* Bankr. Doc. 52-4 (the "Plan").)

---

[2] "Bankr. Doc." refers to documents filed in the U.S. Bankruptcy Court for the Southern District of New York under docket number 14-9022.

2. <u>Parcels A, B, and C</u>

In 1991, FIC purchased a 15.23-acre site in Sullivan County, (Bankr. Doc. 74-1), which is now considered Parcel A. In 1993, FIGI purchased an adjacent 15.667-acre site, (*See* Bankr. Doc. 74-2), 2.7 acres of which are now considered Parcel B and 12.967 acres of which are now considered Parcel C. At the outset and through FIGI's bankruptcy proceedings, the properties were not referred to as Parcels A, B, and C, (together, the "Rock Hill property"); those designations were not used until the events giving rise to the instant dispute occurred. (*See* Bankr. Doc. 60 at 99:2-6, 137:4-19; *see also* Trial Dec. at 2.)

Prior to FIGI's bankruptcy proceedings, FIC and FIGI shared a building as their headquarters on Parcel A, with an address of 195 Lake Louise Marie Road, Rock Hill, New York (the "Headquarters"). (*See* Bankr. Doc. 52-1; Trial Dec. at 2.) There were two additional structures on the Rock Hill property: a daycare center referred to as "Nana's House" and a tool shed referred to as the "pole barn," both on Parcel C. (*See* Bankr. Doc. 52-2.) Nana's House's address was 16 Frontier Drive, Rock Hill, New York, and the pole barn's address was 195 Lake Louise Marie Road, the same as the Headquarters. (*Id.*) Other portions of Parcel C as well as Parcel B were used for parking. (*See* Doc. 7 ("Mem.") at 7 (aerial photo of the Rock Hill property.)

In connection with development of the Rock Hill property, FIGI, FIC, and the County of Sullivan Industrial Development Authority ("CSIDA") entered into a Payment in Lieu of Taxes ("PILOT") agreement, which provided tax relief to FIGI and FIC subject to periodic payments for a twenty-year period commencing on February 28, 1994. (Bankr. Doc. 74-12 at 2.) As collateral under the PILOT agreement, FIC transferred Parcel A to CSIDA in 1993, FIGI transferred Parcel B to CSIDA in 1994, and, in 1997, FIGI deeded Parcel C to FIC, which that

same day deeded Parcel C to CSIDA.  (Bankr. Docs. 74-5, 74-7, 74-8, 74-9.)  At the end of the

twenty-year payment period, CSIDA would transfer the deeds back to the "Company," which

under the PILOT agreement was defined as FIC.  (Bankr. Doc. 74-5 at 24.)  In 1997 and 1999,

the parties expanded the PILOT agreement to include improvements FIGI and FIC were making

to the Rock Hill property, which ultimately included the additions of Nana's House and the pole

barn.  (*See* Bankr. Doc. 74-12 at 2-3.)  The two supplemental PILOT agreements also provided

that, upon completion of the payments, CSIDA would convey title to the Parcels back to the

"Company," which is defined in both agreements as FIC.  (Bankr. Doc. 74-11 at 15; Bankr. Doc.

74-13 at 12-13.)

### 3.    FIGI's Bankruptcy

In 2003, the Insurance Management Group, Inc. ("IMG") bought the debt secured by a

first lien on substantially all of FIGI's assets.  (Bankr. Doc. 48 ¶¶ 3-4.)  FIGI then commenced its

chapter 11 case with the goal of enabling IMG to obtain FIGI's interest in FIC, along with FIGI's

other property.  (*Id.* ¶ 4.)  In connection with its chapter 11 petition, pursuant to 11 U.S.C. § 521,

FIGI filed a Schedule A listing all of the real property in which it had any legal, equitable, or

future interest.  (Bankr. Doc. 52-1.)  FIGI listed Nana's House, the Headquarters, and the pole

barn – by name and address – as property in which it was a successor in interest to CSIDA, and

listed that it was the "100% owner" of a property at an address in Monticello, New York.  (*Id.*)

On August 16, 2005, FIGI filed an Amended Schedule A, which omitted reference to the

Headquarters but was otherwise the same as the first Schedule A.  (Bankr. Doc. 52-2; *In re*

*Frontier Ins. Grp., Inc.*, No. 05-36877, Doc. 56.)  FIGI did not specify any interest in the land on

which any of the structures sat.  Suzanne Loughlin, FIGI's Executive Vice President in 2005,

(Doc. 49 ¶ 1), testified that she did not distinguish between the structures and the land on which

they sat because the reference to the structure implied a claim over the property underneath it, (*see* Bankr. Doc. 60 at 108:25-109:10).[3] Loughlin further testified that she provided no description for the land on which the Monticello property sat, but that land was sold and the proceeds transferred into a litigation trust. (*See id.* at 109:3-6)

On August 29, 2005, Neal Conolly, the administrator of FIC designated by the Rehabilitator, filed a $43,230,580 proof of claim against FIGI, but it made no claim to Nana's House, the pole barn, the neighboring parking lots, any real estate, or any rights concerning real estate. (*See* Bankr. Doc. 52-12 at 92:22-93:4; Bankr. Doc. 52-7.) FIC and FIGI then entered into negotiations to "resolve everything that was outstanding." (Bankr. Doc. 52-11 at 50:24-51:4.) During the negotiations, it was Conolly's and FIC's understanding that FIGI owned Nana's house, the pole barn, and the adjacent parking lots, which together make up Parcels B and C. (*Id.* at 50:9-20.) Even though the PILOT agreements indicated that the reversionary interest belonged to FIC, FIC believed those provisions of the PILOT agreements were drafted in error. (Bankr. Doc. 52-12 at 87:6-9, 89:14-19, 90:5-24.) FIGI too believed that it owned the reversionary interest in Parcels B and C. (Doc. 49 ¶ 5.)

FIC and FIGI reached an agreement, which was later incorporated into the Plan. (Bankr. Doc. 52-6 ¶ 1; *see* Bankr. Doc. 52-8.) Pursuant to the settlement agreement and the Plan, FIC was to receive, among other things, a $12 million allowed unsecured claim and certain personalty. (Bankr. Doc. 52-8 ¶¶ 3, 5.)[4] At no point during the bankruptcy proceedings did FIC

---

[3] The transcript of Loughlin's testimony reads that she was asked if she "separated[d] in her mind the structures from the [indiscernible]," (Doc. 60 at 109:7-8 (alteration in original)), but based on the context, it is clear that the question was whether Loughlin separated the structure from the land on which it sat.

[4] The settlement agreement never became effective because it was not approved by the state court supervising FIC's rehabilitation. (Trial Dec. at 29.)

make a claim to or assert an interest in Parcels B and C.  (Bankr. Doc. 52-12 at 92:22-93:4; *see* Bankr. Doc. 52-11 at 37:22-39, 42:14-17, 44:2-20.)  After reaching an agreement with FIGI, FIC voted affirmatively to accept FIGI's Plan.  (Bankr. Doc. 52-9 ¶ 10.)

On October 17, 2005, FIGI filed the Plan with the bankruptcy court.  The Plan defined FIGI's "Assets" as including "all . . . real property interests."  (Plan at 3.)  FIGI's First Amended Disclosure Statement noted that "the Assets of the Debtor [FIGI], except for the Trust Assets [not relevant here], shall revest in the Reorganized Debtor [FIGL] free and clear of all Liens, Claims and Equity Interests pursuant to Section 11.01 of the Plan."  (Bankr. Doc. 52-5 ("Disclosure Statement") at 33.)  The Disclosure Statement also made specific reference to the Schedule A and Amended Schedule A that FIGI had filed with the court.  (*See id.* at 20.)  The only assets that the Disclosure Statement actually identified, however, were FIGI's "significant assets," which did not include the Rock Hill property.  (*Id.* at 13-17.)

As a condition precedent to confirmation of the Plan, FIGI required the bankruptcy court to enter a final order approving its Disclosure Statement.  (Plan § 10.01).  On December 1, 2005, the bankruptcy court confirmed the Plan and Disclosure Statement.  (Bankr. Doc. 52-10 at 14 ¶ 2.)

4.      FIC's Liquidation Proceedings

In 2012, the Albany County Supreme Court converted FIC's rehabilitation proceeding to a liquidation proceeding, vesting the Liquidator with "title to all of [FIC's] property, contracts and rights of action" and directing the Liquidator to liquidate all of FIC's business and affairs in accordance with New York insurance law.  (Trial Dec. 3-4 (quoting *In re Liquidation of Frontier Ins. Co.*, No. 97-06 (Sup. Ct. Nov. 9, 2012)).  FIGL did not make any claim in the FIC

receivership proceeding asserting an interest in Parcels B or C. (Bankr. Doc. 60 at 126:22-127:9.)

### B. The Proceedings Below

On February 24, 2014, the Liquidator filed a verified petition in Albany County Supreme Court, requesting an order declaring that FIC is the sole beneficial owner of the Rock Hill property and directing CSIDA to execute a deed conveying the Rock Hill property to FIC. *See Lawski v. Frontier Ins. Grp., LLC* (*In re Frontier Ins. Grp., LLC.*), 517 B.R. 496, 502-03 (Bankr. S.D.N.Y. 2014). FIGL subsequently removed the case to the United States District Court for the Northern District of New York and filed counterclaims claiming the reversionary interest in Parcels B and C. *Id.* at 503. On April 28, 2014, the Liquidator moved to remand the case to state court, but the Northern District judge transferred the case and pending motion to the Southern District of New York, where the chapter 11 case had been filed. *Id.*

Chief Judge Cecelia G. Morris of the bankruptcy court denied the Liquidator's motion to remand, and added:

> The Court need not step on the toes of the state court by making a determination on whether the various contracts between and among the parties grant a right of reversion to the Reorganized Debtor. The Court need only look to the plan and confirmation order to determine whether [Parcels B and C were] included in the plan, whether the Liquidator's claim was dealt with in the plan, whether the Liquidator is enjoined from proceeding against the Debtor, whether the Reorganized Debtor is released from any liability and whether a violation of the discharge has occurred, as was alleged by the Reorganized Debtor. The Court believes that it is in a better position than the state court to make such determinations and that doing so would assist, rather than hinder, the state court. If the Court determines that this issue was not covered by the plan, it will send the matter back to state court so that the issue can be decided under state law.

*Id.* at 504. Thus, the bankruptcy court needed to "decide whether [Parcels B and C] w[ere] part of the plan, and as such, whether *res judicata* attaches or whether the FIC is enjoined from bringing its claims against [FIGL]." *Id.* at 507.

On January 6, 2015, the case was transferred from Judge Morris to Judge Robert D. Drain, (Bankr. Doc. 25). Judge Drain recognized the principle that a creditor with an interest in an asset may lose it if, knowing the debtor claims a contrary interest, the creditor allows a plan to be confirmed without contesting the issue. (Trial Dec. at 12.) Under 11 U.S.C. § 1141(c), property "dealt with" in a confirmed plan is free and clear of the claims and interests of creditors, provided the holder of the claim or interest participated in the bankruptcy case. *City of Concord v. N. New England Tel. Operations* (*In re N. New England Tel. Operations*), 795 F.3d 343, 348 (2d Cir. 2015). To address those issues, Judge Drain needed to decide "the issue of whether Parcels B and C were covered by, included in, or dealt with by the Plan and confirmation order, and, more specifically, the context in which those documents should be read," which in turn required the court to engage in "fact-finding regarding the nature of FIGI's disclosure of its asserted property interests during its bankruptcy case, the extent of the involvement of the Liquidator's predecessor, the Rehabilitator, in that case, and the parties' mutual understanding of their respective claims to the property at issue when the Plan was confirmed." (Trial Dec. at 5.) Accordingly, the bankruptcy court held a trial on those issues. (*Id.*)

After trial, Judge Drain found (and the Liquidator does not dispute) that "the Rehabilitator (and thus his successor, the Liquidator), 'participated' in FIGI's case for purposes of section 1141(c) of the Bankruptcy Code under *In re Northern New England Telephone Operations*, 795 F.3d at 350." (Trial Dec. at 14.) Judge Drain further held that because the Plan provided that all of the property of FIGI's estate with the exception of the "Trust Assets" would vest post-confirmation in FIGL, and because Parcels B and C were not listed as "Trust Assets," they vested in FIGL "in a way that satisfies the 'identification' or 'dealt with' requirement of *In re Northern New England Telephone Operations*, 795 F.3d at 349," and thus the Liquidator

could not contest FIGL's free and clear ownership of them, so long as the Plan actually identified those assets as property of the estate for purposes of the Plan. (Trial Dec. at 16.)

Then, turning to the issue most critical to this appeal, Judge Drain found that FIGI's reversionary interest in Parcels B and C was sufficiently identified during FIGI's chapter 11 case. Under the pre-bankruptcy documents, *i.e.*, the PILOT agreements, "FIC, not FIGI had the reversionary interest in all three parcels." (*Id.* at 18.) But Judge Drain found that the trial record was equally clear that during FIGI's bankruptcy case, "both FIGI and the Rehabilitator treated the reversionary interests in the land on which Nana's house and the pole barn sit and the adjacent parking lot, or Parcels B and C, as FIGI's property and that the Plan was confirmed with that understanding." (*Id.*) For example, FIGI's Amended Schedule A listed FIGI as the "[s]uccessor in [i]nterest" to the CSIDA in Nana's House and the pole barn, which clearly indicates a reversionary interest, and "one can reasonably assume that by listing Nana's House and the pole barn in its schedule of assets, FIGI was including the land on which those structures sit among its assets, as well." (*Id.* at 19-20.) Further, Judge Drain found that because "Nana's House and the pole barn did not have an address separate from the general Rock Hill Property address," (*id.* at 20) – which is true for the pole barn but not for Nana's House, (Doc. 52-2) – "[i]t would have been misleading to have identified Parcel C by the Rock Hill Property address because that address also applied to Parcel A, which FIGI did not claim as its property in its amended schedule of assets," (Trial Dec. at 20). Thus, "[b]y listing the buildings on Parcel C in its schedule of assets FIGI sufficiently put the Rehabilitator and other parties in interest on notice of its claim to the land on which they sit." (*Id.* at 21.) The court added that in its experience, "parties in bankruptcy cases routinely identify real property by its address, not by a metes and bounds description, or by [identifying] a building on the site." (*Id.*)

Next, the bankruptcy court took up whether FIGL was judicially estopped from claiming Parcel B as an asset due to FIGI's failure to specifically disclose Parcel B in its Disclosure Statement or Schedule A. First, the court found that FIGI's failure to disclose Parcel B was harmless and not malicious. (*Id.* at 26-27.) Parcel B would not revert to FIGI for several years "even if FIGI had the wherewithal to make the PILOT payments – which it lacked without the assistance of FIGL's parent, IMG – [and thus] the asset's disclosure on FIGI's schedules would not have been material" to the general creditors or any party other than IMG and the Rehabilitator. (*Id.* at 26.) Further, the non-disclosure was by FIGI, not FIGL or IMG which were now claiming an interest in Parcel B. (*Id.* at 26.) Moreover, the terms "Parcel B" and "Parcel C" were not used at the time of the bankruptcy proceedings, but rather, the property was referred to as Nana's House, the pole barn, and their neighboring parking lots. (*Id.* at 27.) Accordingly, the bankruptcy court found that by scheduling Nana's House and the pole barn, "FIGI came almost as close to identifying what the parties now refer to as Parcel B, the parking lot next to them, as they did to identifying Parcel C." (*Id.*)

The bankruptcy court concluded that "most importantly, . . . FIGI, IMG and – critically – the Rehabilitator understood when the Plan was confirmed that FIGI, not FIC, had the reversionary interest not only in Parcel C but also Parcel B." (*Id.*) The court primarily relied on Mr. Conolly who stated that as administrator of FIC, he entered into the settlement with FIGI with the understanding that FIGI had the reversionary interest in Nana's House, the pole barn, and the adjacent parking lots, otherwise known as Parcels B and C. (*Id.* at 28-29.) Among the evidence corroborating Mr. Conolly's testimony was the testimony of Al Escobar – the Chief Executive Officer of FIC during Rehabilitation – that Nana's House, the pole barn, and some of the parking lots heading towards [the Headquarters]" were to revert back to FIGI under the

PILOT agreements, (Bankr. Doc. 60 at 79:1-3), and the testimony of FIGI's representative "that the reversionary interest in Parcels B and C would belong to FIGL as FIGI's successor," (Trial Dec. at 30; *see* Bankr. Doc. 49 ¶ 5). Because the Plan was confirmed with the understanding that FIGL had the reversionary interest in Parcels B and C, "as between FIGL and the Liquidator judicial estoppel should not overcome the effect of 11 U.S.C. § 1141(a)-(c) and *res judicata* to unwind it." (Trial Dec. at 27.) "To rule otherwise based on judicial estoppel or any other equitable doctrine would provide the Liquidator, as the Rehabilitator's successor, with an improper windfall contrary to 11 U.S.C. § 1141(a)-(c) and undo the Plan and Confirmation Order." (*Id.* at 31.)

The bankruptcy court held that "under the Plan the reversionary interests in Parcels B and C are property of FIGL, and the Liquidator is precluded by the Plan and the Confirmation Order from interfering with those interests," and thus the CSIDA was ordered to promptly transfer title to Parcels B and C to FIGL. (*Id.*; Bankr. Doc. 72 at 3.)

Judge Drain entered partial judgment on March 13, 2018, (Bankr. Doc. 72), and on April 12, 2018, Plaintiff-Appellant filed his notice of appeal, (Doc. 1).

## II.   LEGAL STANDARD

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court. A district court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions *de novo*. *Overbaugh v. Houshold Bank, N.A.* (*In re Overbaugh*), 559 F.3d 125, 129 (2d Cir. 2009) (*per curiam*). "When reviewing for clear error, [I] may reverse only if [I am] left with the definite and firm conviction that a mistake has been committed." *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (internal quotation marks omitted). "Thus, if the factual findings of the bankruptcy court are

plausible in light of the record viewed in its entirety, this Court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Savage & Assocs., P.C. v. Williams Commc'ns* (*In re Teligent Servs., Inc.*), 372 B.R. 594, 599 (S.D.N.Y. 2007) (internal quotation marks omitted). And "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

### A. Judge Drain Properly Considered FIGI's Amended Schedule A

Plaintiff-Appellant argues that Judge Drain erred because neither the Amended Plan nor the Amended Disclosure Statement indicated that FIGI claimed any interest in Parcels B or C, and the court's confirmation order made no reference to them. (Mem. at 20; *see id.* at 22 (citing *Baeshen v. Arcapita Bank B.S.C.(c)* (*In re Arcapita Bank B.S.C.(c)*), 520 B.R. 15, 21 (Bankr. S.D.N.Y. 2014) ("The preclusive effect of a confirmation order is limited by the content of the reorganization plan and the confirmation order.")).) Accordingly, Plaintiff-Appellant argues even though FIGI's Amended Schedule A may have claimed an interest in those Parcels, because FIGI did not "explicitly incorporate" its Amended Schedule A into its Disclosure Statement or Plan, Judge Drain erred by considering it. (*Id.* at 21-22.)

Plaintiff-Appellant offers no support for the notion that a Schedule A must be "explicitly incorporated" into a Disclosure Statement or Plan to be considered by the bankruptcy court. The case on which Plaintiff-Appellant relies, *In re Arcapita*, involved a plan in which the debtor defined its "Assets," in part, as "*all property disclosed in the Debtor's respective Schedules and the Disclosure Statement*," 520 B.R. at 23 n.6 (emphasis in original), but that case did not hold that the language emphasized above is required to give effect to a debtor's schedules. To the

contrary, cases often discuss whether a debtor sufficiently disclosed or identified assets in "*its Schedules*, Disclosure Statement *or* confirmed Plan." *MF Glob. Holdings USA Inc. v. Heartland Co-Op* (*In re MF Glob. Holdings Ltd.*), No. 11-CV-15059, 2017 WL 1373267, at *1 (Bankr. S.D.N.Y. Apr. 13, 2017) (emphasis added); *see Heritage Hotel Ltd. P'ship v. Valley Bank of Nev.* (*In re Heritage Hotel P'ship I*), 160 B.R. 374, 378 (B.A.P. 9th Cir. 1993) ("a party is equitably estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statement"), *aff'd*, 59 F.3d 175 (9th Cir. 1995); *cf. Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 57 (Bankr. S.D.N.Y. 1999) (finding disclosure insufficient only because the debtor's schedule was never submitted to bankruptcy court or seen by creditors). Here, FIGI filed with the bankruptcy court its Schedule A and Amended Schedule A, (*see* Bankr. Docs. 52-1, 52-2), and referenced those schedules repeatedly in its Disclosure Statement as the source from which FIGI listed, among other things, its assets and creditors' claims, (*see* Disclosure Statement at 15, 20, 22, 26, 28-29). Thus, I see no reason why it would be error to consider FIGI's Amended Schedule A.

Additionally, where a reorganization plan is ambiguous, bankruptcy courts are permitted to examine the case context to determine what creditors are bound by the plan and what property was within the debtor's estate. *See Harper v. Oversight Comm.* (*In re Conco, Inc.*), 855 F.3d 703, 711-14 (6th Cir. 2017). Here, the Plan defined "Assets" broadly as "any . . . real property interests," (Plan at 3), but the Disclosure Statement only identified FIGI's "significant assets," (*see* Disclosure Statement at 13-17). There is thus an ambiguity as to what other assets FIGI had, if any, making reference to other documents appropriate. The Amended Schedule A would be the obvious place to look to determine FIGI's real property interests, and it identified Nana's House and the pole barn. As the parties would have during the bankruptcy proceedings, Judge

Drain was permitted to consider FIGI's Amended Schedule A to determine its assets and estate under the Plan.

### B. Judge Drain Did Not Clearly Err in Finding Parcels B and C Sufficiently Identified

Following trial, Judge Drain found that Parcels B and C were included among FIGI's assets under the Plan because of the Amended Schedule A's reference to Nana's House and the pole barn, as well as the parties' understanding that FIGI possessed the reversionary interest in Nana's House, the pole barn, and their adjacent parking lots. (Trial Dec. at 20.) "Where . . . a contract is ambiguous, its interpretation in the presence of extrinsic evidence of meaning is a question of fact. Therefore, a district court may reverse a bankruptcy court's interpretation of an ambiguous contract only if it is clearly erroneous." *Castillo v. Gen. Motors, LLC* (*In re Motors Liquidation Co.*), 500 B.R. 333, 339 (S.D.N.Y. 2013) (internal quotation marks and citations omitted), *aff'd*, 578 F. App'x 43 (2d Cir. 2014) (summary order). Further, "[t]here is simply no denying that [the lower court] is much more familiar with this Plan – and with the parties' expectations regarding it – than [I am]." *Dow Corning Corp. v. Claimants' Advisory Comm.* (*In re Settlement Facility Dow Corning Tr.*), 628 F.3d 769, 772 (6th Cir. 2010). Accordingly, Judge Drain's factual findings regarding the interpretation of the Plan are due considerable deference. *Id.*

Judge Drain found that it would have been misleading to identify Parcel C by the Rock Hill property address on the Amended Schedule A because that address also applied to Parcel A. (Trial Dec. at 20.) Judge Drain also relied on the fact that the designations Parcels A, B, and C were not used by the parties while the bankruptcy proceedings were taking place, so identifying Parcel C by listing buildings on that property was a reasonable means to put creditors and others on notice of FIGI's claim to those buildings and the land on which they sat, and would also have

flagged FIGI's interest in the neighboring area on Parcel B. (*Id.* at 2, 21, 27.) Finally, and "most importantly," Judge Drain relied on testimony from representatives of FIC, the Rehabilitator, and FIGI to conclude that all of the parties "understood when the Plan was confirmed that FIGI, not FIC, had the reversionary interest not only in Parcel C but also Parcel B." (*Id.* at 27.)

Except for Judge Drain's erroneous finding that Nana's House, the pole barn, and the Headquarters shared an address, (*id.* at 20), all of the bankruptcy court's factual findings above are supported by evidence in the record. And that error was only a partial one, as Judge Drain was correct that the pole barn and the Headquarters shared an address, and thus it would have been at least confusing to attempt to identify Parcel C by that address or to refer to it by the address of Nana's House, which might suggest FIGI was claiming an interest in less than the full Parcel. Further, as noted, the designations "Parcel A," "Parcel B," and "Parcel C" were not used until the events giving rise to this dispute occurred. (*See* Bankr. Doc. 60 at 99:2-6, 137:4-19.) Thus, as a practical matter, at the time the settlement and Plan were negotiated and consented to by all parties, including the Liquidator's predecessor, the Rock Hill property consisted of 1) the Headquarters, 2) Nana's House and the pole barn, and 3) the parking lots between them. Nobody thought of the land as three parcels. By disclaiming any interest in the Headquarters and the parking lot on its Parcel but claiming an interest in Nana's House, the pole barn and their neighboring parking lots, FIGI indicated – clearly enough for the Liquidator to understand, as he plainly did – that it was claiming an interest in what is now regarded as Parcels B and C but not A.

Finally, testimony from FIC, the Rehabilitator, and FIGI support the finding that they understood, at the time of FIGI's bankruptcy proceeding, that FIGI owned the reversionary interests in Parcels B and C. (*See* Bankr. Doc. 49 ¶ 5; Bankr. Doc. 52-11 at 50:2-20; Bankr.

Doc. 60 at 78:22-79:3.)  Even assuming that sitting as the trier of fact I might have "weighed the evidence differently," that is insufficient to find that Judge Drain clearly erred, as there is ample evidence in the record (even discounting, as I am, Judge Drain's erroneous finding that Nana's House did not have an address of its own) that FIGI's interests in Parcels B and C were among its assets under the Plan.  *See In re Teligent Servs., Inc.*, 372 B.R. at 599.  Accordingly, I find that Judge Drain did not clearly err by so finding.

### C.  Development History of Parcels B and C

Plaintiff-Appellant further argues that even assuming it was understood that FIGI had a reversionary interest in the "parking lots" during the bankruptcy proceeding, the parking lots cannot be considered part of Parcels B and C because they were developed to provide parking for the Headquarters on Parcel A before Nana's House and the pole barn were built.  (Mem. at 18.)  Thus, Plaintiff-Appellant asserts that Judge Drain erred by treating Parcel B as "appurtenant to the two small structures built five years later on the corner of Parcel C," (*id.* at 18), and by considering FIGI's reference to "two ancillary structures . . . to extend to the 12.967 acre parcel on which they sit," (*id.* at 24).  But Judge Drain never determined that the parking lots on Parcels B and C were "appurtenant" to Nana's House and the pole barn rather than to the Headquarters.  Rather, he found that the reversionary interest that FIGI claimed – and that FIGI was understood to possess by all relevant parties involved during the bankruptcy proceeding – included Nana's House, the pole barn, *and their adjacent parking lots*, which together make up Parcels B and C.  (Trial Dec. at 27.)  Whether the cars parked in Parcels B and C were driven by people who worked in a building on Parcel A, C, or anywhere else does not seem relevant to the issues presented here.  All parties understood that FIC had the reversionary interest only in the first parcel deeded to CSIDA, and that FIGI claimed the reversionary interest in the remaining deeded

land. Accordingly, the development history of Parcels B and C does not change my analysis above.

### D. CSIDA Contracts

Plaintiff-Appellant also argues that Judge Drain erred by operating on the mistaken premise that the reversionary interest in Parcel B was an undisclosed asset of FIGI, when it was in fact an FIC asset pursuant to the CSIDA contracts. (Mem. at 15.) But, to the contrary, Judge Drain acknowledged that "under the pre-bankruptcy documents," *i.e.*, the CSIDA contracts, "FIC, not FIGI had the reversionary interest in all three parcels." (Trial Dec. at 18.) Judge Drain noted, however, that the record was "equally clear" that during the bankruptcy proceedings and post-confirmation, FIGI and the Rehabilitator treated the reversionary interest in Parcel B (and Parcel C) as FIGI's property. (*Id.*) Thus, Judge Drain did not rely on any mistaken premises. In fact, Judge Drain avoided "step[ping] on the toes of the state court by making a determination on whether the various contracts between and among the parties grant a right of reversion." *In re Frontier Ins. Grp., LLC.*, 517 B.R. at 504. Instead, he looked to the Plan, the parties' understanding at the time the Plan was made, and FIGI's Amended Schedule A to determine that Parcel B was properly treated as an asset of FIGI, all of which was permissible.

### E. Judicial Estoppel

Plaintiff-Appellant further argues that because FIGI failed to list Parcel B as an asset in its bankruptcy proceedings, it should be judicially estopped from claiming it now. (Mem. at 15-17.)[5] "Judicial estoppel will," generally, "prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy." *BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 192 (2d Cir. 2017). But "the

---

[5] Plaintiff-Appellant makes a judicial estoppel argument only as to Parcel B.

exact criteria for invoking judicial estoppel will vary based on 'specific factual contexts.'"

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).

> Judicial estoppel will generally apply where (1) a party's later position is clearly inconsistent with its earlier position; (2) the party's former position has been adopted in some way by the court in the earlier proceeding; and (3) the party asserting the two positions would derive an unfair advantage or impose an unfair detriment on the party seeking estoppel.

*Edwards v. CGI Grp. Inc.*, No. 11-CV-8611, 2018 WL 4043142, at *4 (S.D.N.Y. Aug. 10, 2018) (internal quotation marks omitted).  Because the purpose of judicial estoppel is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment, "the Second Circuit limits judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *Azuike v. BNY Mellon*, 962 F. Supp. 2d 591, 598 (S.D.N.Y. 2013) (alteration omitted) (quoting *Derosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)).

There is no dispute that FIGI failed to specifically identify Parcel B on its Amended Schedule A, Disclosure Statement, or elsewhere during the bankruptcy proceedings.  Judge Drain, however, found that FIGI's non-disclosure was harmless and not malicious, and thus presents a "unique fact pattern" under which judicial estoppel does not prevent FIGL from now claiming Parcel B.  I agree.

FIGL's current position is not "clearly inconsistent" with its own or its predecessor's positions during FIGI's bankruptcy proceeding.  Evidence in the record shows that during the bankruptcy proceedings, it was FIGI's understanding that it possessed the reversionary interest in Parcel B, (Bankr. Doc. 49 ¶ 5), and that is the same position FIGL takes now.  Its failure to list "Parcel B" at a time when nobody thought of the area as "Parcel B" is – given FIGI's identification of the area by reference to nearby structures – not clearly contrary to the position it

takes now.  Thus, there is no prior inconsistency that would necessitate application of judicial estoppel.  And because there was no former inconsistent position taken by FIGI, there was no inconsistent position adopted by the bankruptcy court.

Finally, refraining from applying judicial estoppel will not result in FIGL deriving an unfair advantage, nor would it impose an unfair detriment on the Liquidator.  Despite the Liquidator's claims to the contrary now, the evidence is that the Rehabilitator understood during the bankruptcy proceedings that FIGI, not FIC, had the reversionary interest in Parcel B, despite the "mistakes made in paper" in the PILOT agreements with CSIDA.  (Bankr. Doc. 52-12 at 89:12-90:12; *see* Bankr. Doc. 52-11 at 50:16-20 (describing the "realty owned by FIGI" as "the Pole Barn and adjacent parking lot, and Nana's House and adjacent parking lot").  The Rehabilitator acknowledged as much at the time, stating that what is now known as Parcel B was not material to FIC.  (Bankr. Doc. 52-12 at 111:2-5.)  The Rehabilitator knew that FIGI was claiming the reversionary interest in Parcel B, (Bankr. Doc. 52-11 at 34:2-8, 37:22-38:21, 50:2-20; Bankr. Doc 52-12 at 89:14-93:4), but made no claim to Parcel B and raised no objection to confirmation of the Plan relative to Parcel B, (Bankr. Doc. 52-11 at 42:14-17), likely because the complex settlement it reached with FIGI was beneficial to it.[6]  Because the Rehabilitator essentially disclaimed any interest of FIC in Parcel B, the Liquidator cannot now claim surprise or prejudice as a result of FIGI's failure to specifically identify Parcel B in its Disclosure Statement or Schedule A.  Indeed, for the reasons explained by Judge Drain, (Trial Dec. at 22), nobody with a conceivable interest in Parcels B or C was deceived.

---

[6] That this settlement never became effective is immaterial to the issue of whether both parties operated with the understanding that FIGI had the reversionary interest in Parcel B.

These facts thus present the "'unusual case' in which a debtor's nondisclosure had at most a '*de minimis* effect' on a prior bankruptcy proceeding" and judicial estoppel is inappropriate. *Clark v. AII Acquisition, LLC*, 886 F.3d 261, 267 (2d Cir. 2018) (quoting *Adelphia*, 748 F.3d at 120); *see Maines v. Last Chance Funding, Inc.*, No. 17-CV-5453, 2018 WL 4558408, at *6 (E.D.N.Y. Sept. 21, 2018) (not applying judicial estoppel where no risk of debtor deriving unfair advantage or risk of unfair detriment on opposing party), *amended on other grounds by* 2018 WL 4610898 (E.D.N.Y. Sept. 25, 2018). Accordingly, I find that Judge Drain was correct in not applying judicial estoppel to FIGL's claim to Parcel B.

### F.     The Extent to Which New York Law Applies

Plaintiff-Appellant argues that because New York law requires that any transfer of property be made via a document containing words of conveyance and a sufficient description of the property to be conveyed, the previous bankruptcy proceedings could not vest the reversionary interest in Parcels B and C in FIGI. (Mem. at 16-17.) But Judge Drain correctly held that Bankruptcy Code § 1141(a)-(c) provides for the vesting of real property upon confirmation of the Plan, even without a deed, and the Plan provides that New York law controls "[e]xcept to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws are applicable." (Plan § 14.05.) Here, the Bankruptcy Code is applicable, and thus under the terms of the Plan, the Bankruptcy Code controls in this situation. Therefore, no written conveyance is needed pursuant to New York law.

### G.     Limiting Effect of FIC's Rehabilitation Status

Plaintiff-Appellant also argues that the bankruptcy court failed to consider that FIC's rehabilitation status granted the state court exclusive jurisdiction over the Parcels and prohibited FIC from transferring any property interests to FIGI without permission from the state court.

(Mem. at 24-26.)  But Judge Drain did not order that the Liquidator transfer anything to FIGL or find that it had.  He only found that under the Plan, the reversionary interests in Parcels B and C rested with FIGL, regardless of who might have owned them pre-bankruptcy.  He did not purport to strip the Liquidator of FIC's interests, but rather only found that even assuming FIC had a right to those interests, the Liquidators' predecessor had lost it when, knowing that FIGI claimed the same interests, it consented to the Plan that would vest them in FIGL.

Further, the Bankruptcy Code's concept of "property of the estate is not concerned with title or possession; it expressly embraces all legal or equitable interests of the debtor in property where located, as of the commencement of the case."  *In re Hudson Valley Ambulance Serv., Inc.*, 11 B.R. 860, 863 (Bankr. S.D.N.Y. 1981); *see Troutman v. Compton* (*In re Greyling Realty Corp.*), 74 F.2d 734, 736 (2d Cir. 1935) ("The court thus acquiring jurisdiction over the property of the debtor does so throughout the United States as against any state or federal receiver theretofore appointed in any other proceeding.").  "Once it is determined that the property in question is 'property of the estate,' it [would] not matter," for instance, "if a state court receiver had actual possession" of it.  *In re Hudson Valley*, 11 B.R. at 863-64; *see Troy Indus. Catering Serv. v. Michigan* (*In re Troy Indus. Catering Serv.*), 2 B.R. 521, 523 (Bankr. E.D. Mich. 1980) (rejecting contention that debtor was divested of property interest because state seized the property).  FIC and the Rehabilitator would have been well within their rights to contest FIGI's claims to Parcels B and C (or Nana's House or the pole barn) during the bankruptcy proceedings, but they may not now claim that the bankruptcy court did not have jurisdiction over the property during those proceedings.  *See In re Hudson Valley*, 11 B.R. at 864 ("the question of turnover and parties' entitlement to the protection of their interests are [to be] resolved in the light of principles under the Bankruptcy Code," not in disputes over jurisdiction).  Accordingly, I reject

Plaintiff-Appellant's argument that Judge Drain erred by failing to consider the limiting effect of FIC's rehabilitation status.

## IV.  CONCLUSION

For the foregoing reasons, the bankruptcy court's order is AFFIRMED in all respects.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated:  March 18, 2019
      White Plains, New York

CATHY SEIBEL, U.S.D.J.